ROGER II. McGLYNN, RECEIVER OF NEPTUNE CENTER
ASSOCIATES, PLAINTIFF, v. MORTIMER L. SCHULTZ,
RICHARD W. SIEBERT, DAVID H. JACKSON, GERALD
I. LEBAU, JACK E. PORTIS, ALEXANDER C. GREYSON,
THOMAS H. VAUGHN, OTTO RUBENS, NORMAN R. BER-
SON, RAYMOND F. WHITE, AND SHERMAN I. HIRSCH-
FELD, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided March 21, 1966.

*Mr. Albert G. Besser* for plaintiff (*Messrs. Hannoch, Weisman, Myers, Stern & Besser,* attorneys).

*Mr. Mortimer L. Schultz, pro se.*

*Mr. Louis Kraemer* for defendants Richard W. Siebert, David H. Jackson, Gerald I. Lebau, Jack E. Portis, Alex-

ander C. Greyson, Thomas H. Vaughn and Sherman I. Hirschfeld.

*Mr. George S. Hochberg* for defendants Norman R. Berson and Raymond F. White (*Messrs. Waldor, Beckerman, Hochberg & Franzblau,* attorneys).

MINTZ, J. S. C. Plaintiff, receiver of Neptune Center Associates (N. C. A.), a limited partnership of New Jersey, seeks damages from the defendants for their alleged active participation or negligent acquiescence in the diversion by Office Buildings of America, Inc. (O. B. A.) of $414,900 asserted to be trust funds belonging to the partnership. These funds consist of the moneys originally invested in the partnership by the partners for the specific purpose of acquiring title to premises known as Neptune City Shopping Center.

At all times hereinafter mentioned the following defendants were either officers and/or directors of O. B. A.:

Mortimer L. Schultz—President, chairman of the board, director, member of the executive committee.

Richard W. Siebert—Vice-president, director, member of the executive committee.

David H. Jackson—Director, member of the executive committee.

Gerald I. Lebau—Director, member of the executive committee.

Jack E. Portis—Second vice president, director.

Alexander C. Greyson—Director, member of the executive committee.

Thomas H. Vaughn—Director.

Otto Rubens—Director.

Norman R. Berson—Director, member of the executive committee.

Raymond F. White—Secretary.

Sherman I. Hirschfeld—Comptroller, treasurer, director.

Additionally, defendants Berson, Hirschfeld and White were president, treasurer and secretary, respectively, as well as directors of First Jersey Securities Corp. (First Jersey), a wholly owned subsidiary of O. B. A. Defendants Schultz, Siebert, Hirschfeld, Berson and White were part of the management team for O. B. A. and devoted their full time and efforts to the affairs of O. B. A. and First Jersey. The remaining defendants have outside interests and became board members of O. B. A. as a result of having invested in one or more of the O. B. A. syndicates, or through the purchase of O. B. A. stock. Defendant Schultz was the dominant personality in the conduct of the affairs of O. B. A. and First Jersey.

During trial, dismissals were entered as to defendants White and Portis. White was Schultz's personal secretary as well as secretary to O. B. A. He exercised no management functions, had no authority, and at all times was responsible to and followed the directions of defendant Schultz. Portis lives in Chicago and was not present at any of the important directors' meetings to be noted later. He did not exercise any of the functions normally reserved to directors nor was he in a position to know the details of the corporation's business. *Cf. Ark-Tenn Distributing Corp. v. Breidt*, 209 *F. 2d* 359 (3 *Cir.* 1954). Prior to trial the attorney for the plaintiff-receiver accepted a settlement with Rubens for $500 on the grounds that Rubens as a director had done all that he could to see to it that the fund in question was preserved for the partnership, and a dismissal was entered. This amount was required to absorb the expenses to be incurred in connection with effecting the dismissal as against said defendant.

N. C. A. was organized by agreement dated March 20, 1963 and acknowledged on May 14, 1963 by defendant Schultz as general partner and defendants Berson and Siebert as original limited partners, and filed on May 21, 1963. O. B. A. was a New Jersey corporation engaged in the real estate syndication business. First Jersey was an underwriter for real estate syndications and was a wholly owned subsidiary of O. B. A.

O. B. A. would acquire an income-producing property which it would in turn convey, or assign its contract to purchase, at a profit to a limited partnership. O. B. A. would then take back a net lease from the partnership, the rental usually calculated to return 9% or 10% of the partner's investment. The N. C. A. arrangement was typical.

At the regular meeting of the O. B. A. executive committee on February 27, 1963, attended by Schultz, Lebau, Jackson, Siebert and Berson, as its members, Hirschfeld by invitation, and White as secretary, Siebert reported that negotiations were being conducted for the purchase of the Neptune City Shopping Center. The owners were asking $400,000 in cash over mortgages of approximately $1,850,000. It was unanimously agreed that the company look favorably toward the acquisition of this property.

The annual meeting of the board of directors was held on March 11, 1963. Schultz, Lebau, Vaughn, Greyson, Hirschfeld, Siebert and Rubens attended in their capacity as directors. White was present as secretary. The minutes of that meeting indicate that Siebert reported that the company had definitely decided to purchase the shopping center and would enter into a contract before the end of the week. They further indicate that the contract terms were explained and the attending members of the board were told that the property was to be syndicated for about $720,000. At this time the board approved the terms of the contract.

On March 19, 1963 O. B. A. executed two contracts to purchase the Neptune City Shopping Center. Two contracts were needed because the property was composed of two distinct parcels, each owned by separate entities. Altogether, $400,000 in cash was involved, the bulk of the purchase price being the assumption of existing mortgages. The contracts provided for September 25, 1963 as the closing date. A $100,000 deposit was paid by O. B. A. out of its general funds upon execution of the contract. This money had been borrowed by it from third persons for this specific purpose.

N. C. A. was organized under O. B. A. auspices for the express purpose of acquiring title to the shopping center. First Jersey prepared an offering of limited partnership units for sale to the public. Capitalization was to be in the sum of $720,000, the amount O. B. A. desired for the assignment of its interest in the shopping center over and above the assumption of all existing and new mortgages by N. C. A. Thus, the gross profit to O. B. A. in this transaction was to approximate $320,000. Immediately after the execution of the contracts to acquire the properties a prospectus was prepared and circularized among all O. B. A. shareholders and investors in earlier syndications.

Using this prospectus as part of its sales technique First Jersey sold limited partnership shares in N. C. A. to the general public. From March 29, 1963 through May 29, 1963 First Jersey collected from the limited partners $414,900, which was deposited in its own account and later remitted to O. B. A. at the direction of defendant Schultz. This fund was deposited in the general O. B. A. bank account and was used to meet other O. B. A. obligations as they accrued. The N. C. A. limited partnership agreement expressly provided for a separate bank account. Paragraph 15 states:

"All funds of the Partnership are to be deposited in the Partnership name, in such bank account or accounts as shall be designated by the General Partner. Withdrawals from any such bank account or accounts shall be made upon such signing or signatures as the General Partner may designate."

However, no such individual bank account was opened for N. C. A. At this juncture all that existed was a contract between O. B. A. and the sellers of Neptune City Shopping Center, with a closing date set for September 25, 1963. O. B. A. did not assign this purchase contract to N. C. A., nor did it contract in writing to turn the property over to N. C. A. upon closing with the sellers. No arrangement was made to protect the interests of the N. C. A. partners. The best that can be said is that the directors of O. B. A. orally

agreed that title was to be transferred to N. C. A. Significantly, the investors in N. C. A. were not apprised respecting the "informality" of these arrangements.

Before title to the shopping center could be closed, O. B. A. on June 25, 1963 petitioned for an arrangement under Chapter XI of the Bankruptcy Act, and on August 26, 1963 was declared bankrupt. During March, April and May 1963 over $1,200,000 passed through O. B. A.'s general account, of which $414,900 was collected from the N. C. A. partners. On June 25, 1963, when O. B. A. filed its petition in bankruptcy, it had only about $7,000 in its bank account. If it were not for the influx of funds collected from N. C. A., O. B. A. would have overdrawn its bank account during March, April, May and June 1963 by about $400,000.

This failure to take steps to protect the interests of N. C. A. in the funds collected is the basis of plaintiff's attempt to hold the defendants individually liable. It is argued that their failure to assume the duty of assuring that N. C. A.'s funds were maintained and protected for the purpose for which they had been collected is actionable. Plaintiff urges that the evidence establishes that defendants either diverted trust moneys to other corporate purposes, *Hirsch v. Phily,* 4 *N. J.* 408 (1950), negligently performed their fiduciary duty so as to be the cause of the partnership's loss, or knowingly aided a fiduciary in the breach of his duty or ratified his actions. *Williams v. McKay,* 40 *N. J. Eq.* 189 (*E. & A.* 1885); *Judson v. Peoples Bank & Trust Co.,* 25 *N. J.* 17 (1957). It matters not that the individual defendants did not personally benefit from any alleged conversion of trust funds and acted merely as agents for a corporation. *Hirsch v. Phily, supra.*

During trial it became clear that there were two pivotal issues in this case: (1) were the funds collected from the N. C. A. partners trust funds, and (2) if so, is the alleged advice of counsel a good defense considering all the facts of this case? Other facts in evidence will be disclosed as they become necessary to the discussion at hand.

## I.

At the outset it should be noted that the New Jersey Legislature enacted a Real Estate Syndication Offerings Law, *L.* 1963, *c.* 192, §2; *N. J. S. A.* 49:3–27 through 49:3–44, effective as of January 1, 1964, which makes the trust issue moot for new real estate syndicates. The act explicitly provides that *all* funds raised for real estate syndicates, like those in question here, are trust funds until actually employed in connection with the consummation of the transaction. *N. J. S. A.* 49:3–40. However, the statute and its legislative history do not indicate whether this statute was creating new law or codifying the prevailing common law. Since the N. C. A. syndication was established prior to the effective date of this statute, it is no help in deciding this issue.

Defendants urge that real estate syndications are *sui generis* and that the syndicator or promoter owes no fiduciary duty to the syndication it creates. Hence, in the instant situation, the N. C. A. funds that came into the possession of O. B. A. were not trust funds. Defendants never articulated the significance of *"sui generis"* in the attendant circumstances of this case. While the precise situation here presented may be one of novel impression or *"sui generis,"* it still remains the task of this court to resolve the issues upon established principles of law.

First, as to defendant Schultz. He was the general partner in N. C. A. and as such owed each limited partner a fiduciary duty which he violated. *N. J. S. A.* 42:2–13; *N. J. S. A.* 42:1–21. *Cf. Cusano v. Cusano,* 19 *N. J. Super.* 255 (*App. Div.* 1952). It is precisely this holding that was the basis for his being enjoined from exercising his powers as general partner in N. C. A. and other limited partnerships upon complaints filed by limited partners, some of whom are defendants in this case. The mere fact that limited partnerships were being utilized in the unusual setting of the real estate syndication field does not mean that the laws of this State concerning such partnerships may be disregarded. Ad-

ditionally, Schultz as general partner of N. C. A. was in a position of particular confidence which equity will treat as a trust relationship. *Harrop v. Cole*, 85 *N. J. Eq.* 32 (*Ch.* 1915), affirmed 86 *N. J. Eq.* 250 (*E. & A.* 1916); *First Federal Savings & Loan Ass'n of Montclair v. Shaw*, 142 *N. J. Eq.* 585 (*E. & A.* 1947). Clearly, defendant Schultz was a fiduciary for his limited partners in N. C. A., in addition to any fiduciary duty he may have owed to them as president and director of O. B. A.

O. B. A., its officers and directors owed N. C. A. a fiduciary duty in dealing with the partnership funds remitted to O. B. A. by First Jersey, without knowledge on the part of the public investors in N. C. A. O. B. A. caused N. C. A. to come into being. It did not provide N. C. A. with any independent counsel. First Jersey, at O. B. A.'s direction, sold partnership shares in N. C. A. O. B. A. caused the prospectus to be drawn and the partnership agreement for N. C. A. to be executed. Paragraph 35 of the partnership agreement identifies O. B. A. as the syndicator of the property in question. The books and records of N. C. A. were kept by O. B. A. officers on O. B. A. premises. The evidence sustains the conclusion that O. B. A. was the promoter of N. C. A. and as a consequence thereof assumed a fiduciary duty in its dealings with the partnership to the extent at least of assuring the application of N. C. A. funds for their intended purpose. *Arnold v. Searing*, 78 *N. J. Eq.* 146 (*Ch.* 1910); *East Ridgelawn Cemetery v. Winne*, 11 *N. J.* 459 (1953); *Tilden v. Barber*, 268 *F.* 587 (*N. J. D. C.* 1920).

Defendants contend that a debtor-creditor relationship existed between O. B. A. and N. C. A. since O. B. A. agreed to pay the partners in N. C. A. interest on their investment. The prospectus and partnership agreement stated that interest payments to the partnership would begin on April 10, 1963, although N. C. A. would not take title to the shopping center until September 25, 1963, and that distributions prior to that date were taxable income. These interest payments were in fact made prior to the filing of the petition in bankruptcy.

As was said in *State v. Atlantic City Electric Co.*, 23 *N. J.* 259 (1957):

"Whether a trust or a debt is created when one party pays money to another primarily depends upon their intentions. *State v. United States Steel Co.*, 12 *N. J.* 51 (1953). Frequently there is no explicit understanding as to the terms upon which the payee is to hold the funds, and then the nature of the transaction must be divined through consideration of the parties' behavior and the attendant circumstances. *State v. Western Union Telegraph Co.*, 17 *N. J.* 149 (1954) ; 1 *Scott, Trusts*, § 12.2 (1939 *ed.*) ; *Restatement, Trusts*, § 12, *comment* g. \* \* \*" (at *p.* 266)

In the instant situation there was no explicit understanding as to the terms upon which First Jersey and O. B. A. was to hold the money until title to the shopping center passed to N. C. A.

The determinative intent where there is no explicit understanding is that of the owner of the money. *Sayer v. Wynkoop,* 248 *N. Y.* 54, 161 *N. E.* 417 (*Ct. App.* 1928) ; *Brown v. J. P. Morgan & Co.,* 177 *Misc.* 626, 31 *N. Y. S. 2d* 323 (*Sup. Ct.* 1941), reversed in part on other grounds 265 *App. Div.* 631, 40 *N. Y. S. 2d* 229 (*App. Div.* 1943). The reasons for such a rule are particularly apparent in this case where O. B. A. was the "master" of the transaction. O. B. A. controlled what material was published and what representations were made upon solicitation of the funds in question. O. B. A. must be held to comply with the "intention" it induced the unprotected public to assume. It is clear that each limited partner was paying money for the specific purpose of purchasing an interest in real estate. The prospectus indicates that N. C. A. was "formed for the purpose of acquiring Fee Title to the land and buildings known as Neptune City Shopping Center \* \* \*." Paragraph 3 of the limited partnership agreement states, "The purpose of the Partnership shall be to acquire for investment the fee to the premises and improvements described in the aforementioned Contracts."

The prospectus revealed that a contract to acquire the property had been filed and the closing of title set for September

25, 1963, suggesting perhaps that this was a contract between O. B. A. and N. C. A., which was not the case. The limited partnership agreement does disclose that O. B. A. entered into a contract with the sellers to acquire the shopping center, which contract it intended to assign, or to deliver a deed to the limited partnership, but no such formal steps were taken to protect the limited partners. Further confusing the issue, O. B. A. sent a covering letter over the stamped signature of defendant Berson to the limited partners with their partnership certificates, which said that N. C. A. owned the shopping center, which was not the fact. The limited partnership agreement expressly provides that if for any reason closing of title is not accomplished, then the contributions of the limited partners will be repaid to them. It further provides that all funds of the partnership are to be deposited in the partnership name in such bank account or accounts as shall be designated by the general partner. This was not done. It was urged that this provision was to apply only to funds of the partnership that might come into existence after the closing of title, but this is not what the agreement states. A limited partner might reasonably feel that he was amply protected as the funds he invested were being segregated in a special account to be held for a specific purpose, which was not the fact.

The limited partners were not aware nor did they intend to make payments that were to be used by O. B. A. to meet the general obligations of that corporation. They intended to contribute toward a fund to be utilized for the specific purpose of purchasing Neptune City Shopping Center. Under these circumstances this fund was a trust fund and O. B. A. owed N. C. A. a fiduciary duty "on the equitable principle that once moneys have been received or allocated for a certain purpose such moneys become impressed with a definite trust to be disbursed for that purpose only." *National Surety Corp. v. Barth,* 11 *N. J.* 506, 514 (1953).

Defendants rely upon *State v. Atlantic City Electric Co., supra,* and 1 *Scott, Trusts* (*2d ed.* 1956), § 12, for the proposition that the fact that the person receiving the money

agrees to pay interest is strong evidence that the parties intended to create a debt relationship and not a trust. However, interest is only one element of the parties' intentions and may be overcome by other evidence of their behavior and circumstances. The court in *Atlantic City Electric* also took into consideration as evidence of the intention of the parties the custom and usages of the business involved. The payee was a public utility that had commingled customer deposits with its general funds for over 30 years and never implied that the funds would be kept separate or dedicated to a specific purpose. The deposits were solely for its own benefit. The present circumstances are much different. N. C. A. was organized to take title to the shopping center, and participations were solicited to accumulate the amount required for the purchase price. Thus, the moneys were being deposited for a special purpose. If they were dissipated, the partnership purpose would be frustrated—the shopping center would not be acquired by it. In contrast, if the utility lost the deposits, the consumer could still credit it against a debt owed to the utility and receive the benefit of his deposit. In sum, *State v. Atlantic City Electric Co., supra,* is factually distinguishable.

In *Scott, Trusts, supra,* it is said that:

"\* \* \* But where the agreement is to pay interest at a fixed rate, regardless of whether the money is invested or not, it is almost certain that the payee is to have the use of the money and that a debt and not a trust is created. *Even in such a case, nevertheless, it is within the realm of possibility that the payee is not to have the use of the money but is to invest it for the payor or a third person, the payee undertaking that the investment will yield a certain rate of return.*" (at *pp.* 105–106, emphasis supplied)

The interest to be paid prior to closing of title was ¾ths of 1% per month; in other words, the monthly equivalent of 9% per year. The syndication arrangement was to guarantee to each investor the fixed rate of return of 9% per year, precisely the arrangement envisioned by the last quoted sentence from *Scott.*

In many instances courts have held a trust rather than a debt was created, in spite of the fact that the alleged trust instrument provided for a fixed rate of interest regardless of investment yield. *Fesenmeyer v. Salt Springs National Bank,* 92 *F. 2d* 599 (2 *Cir.* 1937); *People ex rel. Nelson v. Illinois Bank & Trust Co. of Benton,* 290 *Ill. App.* 521, 8 *N. E. 2d* 953 (*App. Ct.* 1937); *Thorton v. Koch,* 317 *Pa.* 400, 176 *A.* 3 (*Sup. Ct.* 1935); *City of Canby v. Bank of Canby,* 192 *Minn.* 571, 257 *N. W.* 520 (*Sup. Ct.* 1934); *Commonwealth v. Snow,* 284 *Mass.* 426, 187 *N. E.* 852 (*Sup. Jud. Ct.* 1933); *Reichert v. Guaranty Trust Co. of Detroit,* 260 *Mich.* 504, 245 *N. W.* 785 (*Sup. Ct.* 1932); *Spencer v. Clarke,* 25 *R. I.* 163, 55 *A.* 329 (*Sup. Ct.* 1903). In all these cases the court considered the payment of interest as one of the evidentiary factors to be considered, but not as the conclusive determining factor. See *Restatement, Trusts 2d,* § 12, *comment* (g) for the seven factors recommended for consideration as indicators of the parties' intent.

*Commonwealth v. Snow, supra,* presents a situation closely analogous to the present case. There defendant was indicted for embezzlement on the grounds that he commingled trust funds with his general office funds in breach of his fiduciary duties. He contended that he did not owe a fiduciary duty to anyone, since the payment of the interest indicated that the relationship established was that of debtor-creditor. The facts were that defendant accepted money from investors with the express provision that he was to invest it in first mortgages and was to pay interest at the fixed rate of 7% per annum from the date indicated upon the deposit certificate, irrespective of when the funds were invested. The Supreme Judicial Court of Massachusetts upheld the trial court's finding of fact that a trust was created. It emphasized that this issue is one for the finder of fact to determine. The evidence that the depositors were turning over the funds to defendant for a specific purpose and that the depositors never authorized the use of said funds for any other purpose was deemed important. In the present case there is a greater degree of specificity present,

since the funds were earmarked to purchase an interest in specific realty — not as in *Snow,* to be invested in any mortgages the defendant should select.

All the attendant circumstances indicate that the $414,900 collected to purchase interests in N. C. A. were funds of that partnership to be held in trust for the specific purpose of acquiring title to the Neptune City Shopping Center.

## II.

Defendants contend they relied upon the advice of counsel that they were under no duty to escrow or segregate the funds in question. In doing so they acted as reasonably prudent men and hence are not liable for any breach of trust. Plaintiff urges that advice of counsel is not available to a fiduciary as a defense when the breach complained of was a mistake as to the existence of duties or powers. *Restatement, Trusts 2d,* § 201 (1959); 2 *Scott, Trusts, supra,* § 201. The rule as articulated by the *Restatement* and by Professor Scott is based upon the fact that any doubt present as to the extent of trust duties or powers can be resolved by obtaining instructions from the court. Defendants argue that no court would entertain their complaint for instructions; that the rule enunciated in the *Restatement* is particularly applicable to testamentary trusts or express trusts, and is inapplicable in the instant situation.

Assuming, *arguendo,* the correctness of defendants' position, advice of counsel in itself is not an absolute defense. It is only to be considered in defense to negate the existence of criminal intent, bad faith or negligence. Note, "Reliance on Advice of Counsel," 70 *Yale L. J.* 978 (1961); *Lynch v. Sapiro,* 117 *N. J. Eq.* 485 (*Ch.* 1935); and see *Spirt v. Bechtel,* 232 *F.* 2d 241 (2 *Cir.* 1956); *Gilbert v. Burnside,* 13 *A. D.* 2d 982, 216 *N. Y. S.* 2d 430 (*App. Div.* 1961), affirmed 11 *N. Y.* 2d 920, 229 *N. Y. S.* 2d 10, 183 *N. E.* 2d 325 (*Ct. App.* 1962). Defendants must prove, to sustain their

burden in offering this defense, that they relied upon counsel's advice accurately and in good faith; that said advice was as to a matter of law and given by competent counsel. Note, "Reliance on Advice of Counsel," *supra*. Plaintiff contends that the decision not to segregate the funds in question was dictated by business necessity and not by reliance upon advice of counsel.

During the period immediately prior to the signing of the contract to purchase Neptune City Shopping Center, and at all times thereafter, O. B. A. was "cash shy." The syndicated properties were not producing enough income to pay the 9% or 10% guaranteed under the net leases to investors in the various syndications organized under the aegis of O. B. A. O. B. A. had to resort to other resources to pay these distributions, which resulted in a substantial cash drain. It was imperative that O. B. A. continue to syndicate new properties so that the exorbitant profits it made would be available to meet these various cash demands as well as their own huge operational expenses.

Dr. Otto Rubens, a director of O. B. A., was aware that the company had a cash problem. In an undated letter received by defendant Schultz on April 8, 1963, Dr. Rubens expressed concern over the proposed declaration of a cash dividend on the O. B. A. stock as he desired to be sure that "payment of a dividend does not jeopardize the liquidity of the company." He also suggested that the first $425,000 received from the sale of Neptune Center participation units be placed in an escrow account.

Defendant Schultz took this letter to the office of Fox & Schackner, attorneys for O. B. A., at which time Mr. Schackner told Schultz to answer the letter. Schultz, in Schackner's presence, dictated his reply in a letter dated April 8, 1963 in which he acknowledged his receipt of Dr. Rubens' letter and promised to bring the letter to the attention of the executive committee. He indicated that while the suggestion to escrow the fund was a good one, it should be coupled with "an affirmative commitment for turn-around cash or other cash require-

ments, in the event the isolation of such moneys would tend to have an effect upon us."

Dr. Rubens called Dr. Lebau, a member of the executive committee, and asked him to see to it that this matter was discussed at the forthcoming April 10 executive committee meeting. Schultz, at this meeting with Lebau, Jackson, Siebert, Greyson, Schackner and Hirschfeld present, read into the record the Rubens letter and his reply thereto. The minutes specify in regard to the paragraph in the Rubens letter concerning escrowing funds that "it was unanimously agreed that although his point was well taken, it would be impracticable at this time for the company to adopt the suggestion." Several of the defendants testified that the decision was preceded by a discussion during the course of which Schackner told the committee that there was no legal or statutory requirement to escrow. Schackner categorically denied that he gave any such advice at this time.

On April 24, 1963 a special meeting of the full board of directors was held with directors Berson, Rubens and Vaughn present, in addition to those who were at the executive committee meeting. At the urging of defendant Vaughn, the Rubens letter and the Schultz reply were again read and a discussion ensued. At this time Schackner advised the board that to his knowledge there was no statute in New Jersey that required that such moneys be held in escrow. He testified that he informed them a statute had been proposed but not yet enacted which would require all proceeds from the sale of limited partnership interests be escrowed until title closed, not merely the amount needed to close title as Dr. Rubens proposed. No formal vote was taken, but clearly the board members, except for Rubens, ratified and approved the decision of Schultz and the executive committee not to escrow or segregate the N. C. A. funds. These discussions on April 10 and April 24 made it perfectly plain to all defendants that O. B. A. was using funds solicited from investors in N. C. A. to meet current operational expenses and distribution payments for other syndications, and that the only assurance

N. C. A. had that funds would be available to close title on September 25, 1963 was the integrity and financial responsibility of O. B. A.

In the spring of 1963 Schultz and Hirschfeld clearly knew of O. B. A.'s poor cash position. They knew that the Texas properties were doing badly and that the other properties not leased to O. B. A., except for one, were not generating enough income to cover all necessary charges and distributions. Schultz testified that O. B. A. was subsidizing the dividend or distribution payments to the various syndicates to the extent of about $250,000 per year. Hirschfeld testified that Schultz was disturbed by the fact that the daily cash position of O. B. A. was poor. Schultz had Hirschfeld prepare figures that they saw daily which indicated the daily cash position of O. B. A.

The members of the executive committee knew or should have known of O. B. A.'s cash problem. All of them had repeatedly been advised of the problems concerning the Texas properties. The minutes of the executive committee meeting of February 13, 1963 note a discussion concerning the vacancy problem with the San-Mac properties in Texas. Hirschfeld told the executive committee and the other directors that the various syndications were not producing enough income to cover all operational expenses and guaranteed distribution payments, although in the same breath he assured them there was no cause for concern. Both Hirschfeld and Schultz testified that the directors knew that it was necessary for O. B. A. to continue to syndicate property to stay in business. Additionally, Jackson admittedly knew the cash position of O. B. A. was "light," but he did not think it was so weak that the company would "fold." Greyson demanded that Schultz produce a breakdown of all operational expenses of O. B. A. because of his concern that with all the profits O. B. A. was making, there was little cash available. He received something from Schultz which he deemed inadequate. Each member of the management team, who are also members of the executive committee, namely Schultz, Berson, Siebert

and Hirschfeld, was aware of the cash problem as it was discussed at informal meetings held in the spring of 1963.

Berson, Dr. Vaughn and Dr. Rubens were present at the April 24 board of directors meeting in addition to those who were present at the April 10 executive committee meeting. Berson was a member of the management and, as already observed, knew of the cash plight of the corporation. Dr. Vaughn took a trip with defendant Schultz to Texas to review investment possibilities there, at which time Schultz informed him of the problems with the Texas properties. Despite the fact that Dr. Rubens was not elected a director until March 11, 1963, he knew of the cash problem, attempted to convince the board to escrow the first $425,000 of N. C. A. funds, and even voted on April 24 against declaring dividends on O. B. A. stock for fear that O. B. A.'s liquid position would be affected.

The members of the executive committee and the full board of directors knew or should have known that O. B. A. had to borrow $100,000 for the deposit on the contract to purchase the Neptune City Shopping Center. They knew or should have known that loans were routinely required to provide the down-payment for a property to be syndicated. These loans were always from private sources at generous interest rates. Additionally, in his letter reply to Dr. Rubens, which was read at the April 10 and April 24 meetings, Schultz expressed concern for "turn-around cash or other cash requirements in the event the isolation of such moneys would tend to have an effect upon us." These facts should have alerted the directors to the poor cash position of O. B. A.

Some of the defendants testified that Hirschfeld, in addition to explaining how O. B. A. handled funds received from N. C. A. through First Jersey, assured the board that O. B. A. had ample "economic profit." Previously they had seen financial statements for the past year that indicated that O. B. A. had made a substantial profit. In essence, these defendants charge that Hirschfeld misled them as to the financial picture of O. B. A. Each director had enough information to beware

of the phrase "economic profit" used to characterize the O. B. A. financial condition. They knew or should have known that not all O. B. A. syndications had been completely subscribed and that O. B. A. held a substantial portfolio of unsold participation units in various syndicates that constituted "paper profits." Additionally, other substantial assets were listed in the O. B. A. balance sheet for the year ending December 31, 1962 which had no apparent liquidity.

Certain defendants argue that the fact that they were prepared to make loans to O. B. A. indicated that they were not aware of O. B. A.'s poor financial position. However, these proposed loans were all of short term duration and at high interest rates. The funds loaned were to be used as deposits on contracts to purchase property for syndication and would be repaid from the proceeds of the first participation shares sold. Under these circumstances such defendants might well feel that the interest return was well worth the slight risk presented, for they anticipated O. B. A. would sell enough participation units to cover any "front money" advanced. Typical of these proposed loans was one actually made by David A. Jackson in May, 1963 in the sum of $25,000 to O. B. A. to be used as part of the down-payment for the proposed purchase of the Seaman Bros. warehouse. The ill-fated loan was to be for a period of three months. Jackson's remuneration was to be a one-half unit in the proposed partnership to take over the property, which was valued at $2,500, the equivalent of a 10% return on a three-month loan, or 40% per year.

I find that all the defendants knew or should have known of the dire cash position of O. B. A. in the spring of 1963, particularly at the time they sanctioned the use of N. C. A. funds to meet the general operational needs of O. B. A.

Plaintiff contends that defendants' knowledge of the poor cash position of O. B. A. plus the asserted "impracticability" in escrowing or segregating N. C. A. funds, and not the advice of counsel, were the determinative factors in the decisions reached at the April 10 and April 24 meetings. Hirschfeld at the April 10 meeting explained to the executive com-

mittee how the books of O. B. A. were kept and how money was being handled. He told the committee that it would be "impracticable" from a bookkeeping standpoint to change the normal mode of procedure to segregate these funds. Hirschfeld testified that he remembered Schultz's saying it would be "economically impractical" to comply with the Rubens suggestion. As already observed, the minutes of this meeting state that the directors unanimously agreed that it was "impracticable at this time for the company to adopt this suggestion." Significantly, at the time of this meeting $165,000 had been received from various limited partners of N. C. A. and O. B. A. had a cash balance on hand of $52,212.42.

As previously noted, Schackner denied giving any legal advice to the executive committee on April 10. He admittedly rendered legal advice to the full board of directors on April 24. Plaintiff urges that the fact that the advice of counsel was not noted in the minutes of the April 10 or April 24 meeting indicates it was not an important factor in the decision. On prior occasions when advice of counsel was important, it was noted in the minutes. By the close of business on April 24, O. B. A. had received an aggregate of $257,400 of N. C. A. funds. On that date the O. B. A. bank balance was $52,422.31.

From all the foregoing it appears that the O. B. A. directors, in deciding not to segregate the N. C. A. funds, may have been motivated by the poor cash position of O. B. A. and the alleged "impracticality" of segregating these funds. Reliance upon the advice of counsel may have also played a role in this decision. However, under applicable legal principles, it is unnecessary to determine the import of the various factors involved and whether or not defendants in good faith relied upon the advice of counsel, and I make no such findings.

### III.

As already observed, the funds in question were trust funds and could only properly be used to acquire title to the

Neptune City Shopping Center. These funds were not so used and, in fact, were converted to O. B. A. purposes. Conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." 89 *C. J. S. Trover and Conversion* § 1, *p.* 531; *Mueller v. Technical Devices Corp.,* 8 *N. J.* 201 (1951).

The elements of good faith, intent or negligence do not play a part in an action for damages in conversion. As is said in 89 *C. J. S.* § 7, *supra:*

"* * * While an intent.to convert consummated by some positive act, is necessary to constitute conversion, it is very generally held that it is not essential to conversion that the motive or intent with which the act was committed should be wrongful, or willful or corrupt, although, as in actions for damages for torts generally, * * * factors of this character may be taken into consideration in determining whether exemplary damages shall be allowed.

It is sufficient if the owner has been deprived of his property by the act of another assuming an unauthorized dominion and control over it. It is the effect of the act which constitutes the conversion. In consequence * * * it has very generally been held that the question of good faith, and the additional questions or elements of motive, knowledge or ignorance, or care or negligence, are not involved in actions for conversion.

\* \* \* \* \* \* \* \*

The general rule is that one who exercises unauthorized acts of dominion over the property of another, in exclusion or denial of his rights or inconsistent therewith, is guilty of conversion although he acted in good faith and in ignorance of the rights or title of the owner. The state of his knowledge with respect to the rights of such owner is of no importance, and cannot in any respect affect the case. * * *" (at *pp.* 536–537)

Since good faith is not a defense to an action for conversion, it follows that good faith reliance upon advice of counsel is likewise no defense. *Spirt v. Bechtel* and *Gilbert v. Burnside, supra,* and the other cases relied upon by defendants are easily distinguishable. They were stockholders' derivative actions seeking to hold directors liable for misconduct in office in breach of their fiduciary duty or for waste in the management of the corporation. In such situations direc-

tors are charged with the duty to act in good faith and as reasonably prudent men. The relevancy of reliance upon advice of counsel in such situations is obvious.

 The tort of conversion has been committed by O. B. A. in diverting the N. C. A. funds. What remains to be determined is whether personal liability can be imposed upon defendant officers and directors of the corporation which committed the tort.

"A director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character, but a director or officer who commits the tort or who directs the tortious act to be done, or participates or cooperates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort. * * *" (*Sensale v. Applikon Dyeing & Printing Corp.*, 12 *N. J. Super.* 171, 175 (*App. Div.* 1951))

Any officer or director who participates by aid, instigation or assistance in a conversion is liable. *Fidelis Factors Corp. v. Du Lane Hatchery Ltd.,* 47 *N. J. Super.* 132 (*App. Div.* 1957); *Rose v. Bernhardt,* 107 *N. J. L.* 501 (*E. & A.* 1931); *Reliable Woodworking Co. v. Lindeman,* 105 *N. J. L.* 121 (*E. & A.* 1928). As was said in 3 *Fletcher Cyclopedia Corporations* (*perm. ed.* 1965), § 1140:

"An officer or agent of a corporation is liable for conversion of property belonging to a third person, notwithstanding that, in disposing of it or otherwise dealing with it, he was acting for the corporation, since 'any person who, however innocently, obtains possession of the goods of a person who has been fraudulently deprived of them, and disposes of them, whether for his own benefit or that of any other person, is guilty of a conversion.' They may be guilty of conversion and fraudulent mismanagement, even though the act constituting such was done for and on behalf of the corporation. * * *"

It does not matter that the conversion was for the benefit of the corporation and that the individual defendants did not personally benefit. *Hirsch v. Phily,* 4 *N. J.* 408 (1950).

 Schultz and Hirschfeld clearly knew the N. C. A. funds were being used to meet the general operating needs of O. B. A. In authorizing and approving this use of the

N. C. A. funds, they participated in the conversion. Additionally, Schultz as general partner in N. C. A., plainly violated his fiduciary duty in permitting these funds to be diverted from their intended purpose.

All defendants present at the executive committee meeting on April 10, 1963 knew as of that date that these funds were being converted to O. B. A. use. They ratified and acquiesced in this conversion. On April 10, if they had acted promptly, they could have taken steps to avoid or at least mitigate any losses that occurred. Failing to have done so, they are individually liable for the losses sustained. *Braman v. Westaway,* 60 *N. Y. S. 2d* 190 (*Sup. Ct.* 1945), modified on other grounds 59 *N. Y. S. 2d* 509 (*Sup. Ct.* 1946); *Walker v. Man,* 142 *Misc.* 277, 253 *N. Y. S.* 458 (*Sup. Ct.* 1931); *Spiegel v. Beacon Participations,* 297 *Mass.* 398, 8 *N. E. 2d* 895 (*Sup. Jud. Ct.* 1937); *Metropolitan Casualty Ins. Co. v. First State Bank,* 54 *S. W. 2d* 358 (*Tex. Ct. Civ. App.* 1932), reversed on other grounds 125 *Tex.* 113, 79 *S. W. 2d* 835, 98 *A. L. R.* 1256 (*Sup. Ct.* 1935); 3 *Fletcher, supra,* § 1100.

By the same rationale, defendants Berson and Vaughn are personally liable for their participation in the conversion of N. C. A. funds. Each of them on April 24 approved and ratified the action of Schultz and the executive committee in permitting the N. C. A. funds to be used by O. B. A. for O. B. A. purposes. Additionally, Berson knew all along that the funds collected from N. C. A. were not being escrowed or segregated. It was this knowledge that led him to deliberately refrain from making any representations about escrowing upon solicitation of sales of N. C. A. participation units. It is noteworthy that funds received through the sale of participation units in N. C. A. after May 29, 1963 were in fact segregated and returned to the owners. Obviously, prompt and similar action on April 24, 1963 by defendants, in accordance with the Rubens suggestion, could have substantially averted the losses suffered by the N. C. A. investors.

Schultz was the dominant figure in the conversion of the N. C. A. funds. The codefendants participated in varying de-

grees of culpability. Perhaps one or more of the codefendants was deceived by Schultz and Hirschfeld respecting the true financial situation of O. B. A. Perhaps one or more of the codefendants may have been influenced by the advice of counsel, a point I am not required to resolve. The significant facts are simply that innocent investors in N. C. A. entrusted their funds for a specific purpose, and that defendants participated in the diversion of these funds.

Plaintiff's claim is for $414,900 plus interest. Prior to trial, the receiver attempted to secure for the partnership the contract between O. B. A. and the sellers of Neptune City Shopping Center on which $100,000 had been paid. However, the trustee in bankruptcy of O. B. A. refused to convey or assign this contract to N. C. A., claiming it as an asset of O. B. A. Suits were started by representatives of N. C. A. to impose a constructive trust upon this contract and to enjoin the sellers from making time of the essence on the contract. The end result of these disputes was that the purchase contract was sold for $41,000, and the receiver of N. C. A. and the trustee in bankruptcy settled for $23,000 and $18,000, respectively. Additionally, the receiver settled his claim against the purchaser of the contract from the bankruptcy trustee for $3,000. To the extent of the $26,000 recovered, the damages suffered by plaintiff have been mitigated and this amount shall be deducted from plaintiff's claim. The receiver settled with Dr. Rubens for $500, which was designed to cover the expense incidental to entering such a dismissal. He correctly concluded that he did not have a case against Dr. Rubens, who did not participate in the diversion of N. C. A. funds but rather endeavored to preserve said funds for their intended purpose. Defendants are not entitled to a set-off for this amount, and the cross-claims against Dr. Rubens for contribution are dismissed. Accordingly, plaintiff is entitled to a judgment against all defendants for $388,900.

The allowance of interest in equity is discretionary. *Deerhurst Estates v. Meadow Homes, Inc.*, 64 *N. J. Super.* 134 (*App. Div.* 1960), on remand 71 *N. J. Super.* 255 (*Law*

*Div.* 1961) ; *Kleinert v. DeChiaro,* 44 *N. J. Super.* 365 (*App. Div.* 1957). Under all the stated circumstances, interest at 6% will be allowed as against defendant Schultz from September 25, 1963, and disallowed as to the remaining defendants. *Cf. Brown v. Home Development Co.,* 129 *N. J. Eq.* 172 (*Ch.* 1941).

A form of judgment shall be submitted, consented to as to form or to be settled on notice.